# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FINOM MANAGEMENT GMBH and DR. KLAUS JOHANN FISCHER,<br><br>　　　　Plaintiffs,<br>　v.<br><br>CELERION HOLDCO, LLC; MTS HEALTH INVESTORS, LLC; CHRISTOPHER J. BURNES; PETER J. CROWLEY; CURTIS S. LANE and SUSAN C. THORNTON,<br><br>　　　　Defendants. | C.A. No. 18-1213-LPS |

Christopher J. Day, DAY LAW GROUP, LLC, Wilmington, DE;

Joseph M. Donley, Peter Blume, and Christopher M. Brubaker, CLARK HILL PLC, Philadelphia, PA,

　　Attorneys for Plaintiffs.


Travis S. Hunter, Tyler E. Cragg, and Alexandra M. Ewing, RICHARDS LAYTON & FINGER, P.A., Wilmington, DE,

　　Attorneys for Defendants.

## **MEMORANDUM OPINION**

September 17, 2019
Wilmington, Delaware


STARK, U.S. District Judge:

## I. INTRODUCTION

Pending before the Court is Defendants Clerion Holdco, LLC ("Celerion"), MTS Health Investors, LLC ("MTS"), Christopher J. Burnes, Peter J. Crowley, Curtis S. Lane, and Susan C. Thornton's (collectively "Defendants") motion to dismiss for failure to state a claim. (D.I. 11) On August 9, 2018, Plaintiffs Finom Management GMBH ("Finom") and Dr. Klaus Johann Fischer ("Fischer") (collectively "Plaintiffs") sued Defendants on various claims of breach of contract, breach of fiduciary duties, and fraud. (D.I. 1) ("Compl.") The motion is fully briefed (*see* D.I. 12, 15, 17) and the Court heard oral argument on April 29, 2019 (*see* Transcript) ("Tr"). For the reasons stated below, the Court will grant in part and deny in part Defendants' motion.

## II. BACKGROUND

On January 4, 2016, pursuant to a Stock Purchase Agreement, Plaintiffs sold Assign Clinical Research GmbH ("Assign") and acquired ownership interests in Celerion. (Compl. ¶ 15) Previously, Plaintiff Fischer had owned 100% of Finom, which had owned Assign. (*Id.*) As consideration for the sale of Assign, Finom was granted 209,000 fully-vested Class A Membership Interest Units in Celerion (hereinafter, "Units" or "shares"). (*Id.*) Plaintiff Fischer was granted 29,928 Class B Profits Interest Units, 7,482 Class C Units, and 7,482 Class D Units (all also referred to hereinafter as "Units" or "shares"). (*Id.*) Fischer's Units vested throughout his employment with Celerion as set out in a December 21, 2015 Executive Securities Award Agreement ("Award Agreement"). (*Id.* ¶ 17) In particular, 25% of Fischer's Class B shares vested at closing, followed by equal monthly installments vesting over the next three years if he continued to be employed by Celerion. (*Id.*) Fischer's Class C and D shares would vest upon

the sale of Celerion, unless Fischer's employment terminated for any reason prior to such a sale. (*Id.* ¶¶ 17-18)

"The Award Agreement granted Celerion the option to repurchase all or any portion of Fischer's vested Units at 'Fair Market Value' in the event Plaintiff Fischer ceased to be employed by Celerion or any of its subsidiaries for any reason." (*Id.* ¶ 19) "Fair Market Value" was defined according to Article XIII of Celerion's LLC Agreement ("LLC Agreement"), as follows:

> The "Fair Market Value" of any Unit, unit of membership interests, or any other asset or security held by the Company [Celerion] shall mean the fair market value thereof as of the date of valuation as determined by the Board in its good faith judgment taking into account all relevant factors determinative of value.

(*Id.* ¶ 20)

On March 9, 2017, Celerion notified Fischer that it would terminate him on June 30, 2017, and further advised him it would exercise its option to repurchase Fischer's 11,223 vested Class B Units and Finom's 209,000 vested Class A Units. (*Id.* ¶ 22) Celerion purchased these shares from Plaintiffs on July 13, 2017, pursuant to a Redemption Agreement ("the Redemption Agreement"). (*Id.* ¶ 23) Celerion paid Plaintiffs a total of 1,500,000 Euros (the "Purchase Price") and warranted that "the Purchase Price is equal to the 'Fair Market Value' as defined in Article 13 of the LLC Agreement." (*Id.*) On June 16, 2017, in a one-page email, Defendant MTS' CEO justified the calculation of the Purchase Price. (*Id.* ¶ 24) This email did not include any mention of a potential purchase of Celerion by Court Square or any other party. (*Id.*)

The Redemption Agreement also included a release of certain rights:

> The Members, on behalf of themselves and their respective affiliates, successors, and assigns (collectively, "Member Releasors") hereby ***release, waive, and forever discharge the Company*** and its respective affiliates, employees, officers, directors, shareholders, members, agents,

2

> representatives, permitted successors, and permitted assigns (collectively, "Company Releasees") of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, obligations, costs, liens, bonds, covenants, controversies, agreements, promises, damages, judgments, claims, and demands, whether now known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, in law, or in equity (collectively, "Claims"), which any of such Member Releasors ever had, have or hereafter may have against any of such Company Releasees ***arising out of the Members' ownership of the Units, the LLC Agreement and the Executive Securities Agreement, except for any Claims relating to rights and obligations preserved by, created by or otherwise arising out of this Agreement.*** For the avoidance of doubt, the Employment Agreement between Fischer, Celerion Inc. and Assign Clinical Research GesmbH shall remain unaffected except as agreed in that certain letter agreement among the Parties dated as of the Effective Date.

(D.I. 1 Ex. 4 at 4.1.1) (emphasis added)

Plaintiffs allege, on information and belief, that "in or about early 2017, Court Square Partners ('Court Square'), most probably in addition to other potential buyers, expressed interest in acquiring Celerion in an all-cash transaction in which Court Square preliminarily valued Celerion at a price per Unit that was substantially higher than the price at which Celerion's Board subsequently valued Plaintiffs' shares." (*Id.* ¶ 21) Defendants publicly announced on November 1, 2017 that Court Square had purchased Celerion.[1] (*Id.* ¶ 25)

Plaintiffs also allege that as the initial act of fraud, Defendants intentionally terminated Fischer, in order to cause his Class C and D Units never to vest, and to allow the repurchase of his vested Units prior to the sale. (*Id.* ¶¶ 26-27) Plaintiffs further allege that Defendants delayed closing the Court Square deal until four months after Fischer's termination, in order to avoid a clause in the LLC Agreement providing him rights to a compensatory distribution if a liquidity

---

[1] Defendants assert that the actual date was November 14, 2017, but note that the "discrepancy is immaterial for present purposes." (D.I. 12 at 3 n.3)

event (e.g., a company sale) occurred within three months of a Call Closing date (i.e., repurchase of Units). (*Id.* ¶¶ 28-29) (citing LLC Agreement at Section 11.5.6)

Plaintiffs filed their Complaint on August 9, 2018 against Cerelion, MTS, and individual members of Celerion's board. (D.I. 1) The numerous claims of the Complaint are summarized below:

> Count I: Breach of Contract (Award Agreement) – Fischer Against Celerion
>
> Count II: Breach of Contract (Redemption Agreement) – Plaintiffs Against Celerion
>
> Count III: Breach of Contract (LLC Agreement) – Plaintiffs Against MTS
>
> Count IV: Breach of Fiduciary Duty – Plaintiffs Against Individual Defendants
>
> Count V: Breach of Fiduciary Duty – Plaintiffs Against MTS
>
> Count VI: Aiding and Abetting Breach of Fiduciary Duty – Plaintiffs Against MTS
>
> Count VII: Breach of Covenant of Good Faith and Fair Dealing (Award Agreement) – Fischer Against Celerion
>
> Count VIII: Breach of Covenant of Good Faith and Fair Dealing (Redemption Agreement) – Plaintiffs Against Celerion
>
> Count IX: Breach of Covenant of Good Faith and Fair Dealing (LLC Agreement) – Plaintiffs Against MTS
>
> Count X: Federal Securities Fraud – Plaintiffs Against All Defendants
>
> Count XI: Delaware Securities Fraud – Plaintiffs Against All Defendants
>
> Count XII: Common Law Fraud – Plaintiffs Against All Defendants

(*Id.*)

## III. LEGAL STANDARDS

### A. Rule 12(b)(6)

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

A well-pleaded complaint must contain more than mere labels and conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff must plead facts sufficient to show that a claim has substantive plausibility. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). A complaint may not be dismissed, however, for imperfect statements of the legal theory supporting the claim asserted. *See id.* at 346.

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary

element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

## IV. DISCUSSION

### A. All Claims Other than Counts II and VIII Were Released

Defendants argue that all of Plaintiffs' claims other than those that arise out of the Redemption Agreement (Counts II and VIII) must be dismissed because Plaintiffs released them pursuant to the release clause contained in the Redemption Agreement. The Court agrees.

There is no dispute that, under Delaware law, "releases are treated as other contracts and the Court will give effect to the parties' intent as reflected in the ordinary meaning of the language used." (D.I. 12 at 5 (citing *Intercept Pharm., Inc. v. Fiorucci*, 277 F. Supp. 3d 678, 685 (D. Del. 2017); *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334 (Del. 2012)); D.I. 15 at 6-7 (citing *Riverbend*))

Defendants contend that "an objective, reasonable third party would understand the Redemption Agreement as broadly releasing all claims, except for those arising out of the Redemption Agreement." (D.I. 12 at 5; *see also* Tr. at 7-11) Defendants further contend that Claims I, III-VII, and IX-XII all "aris[e] out of Members' ownership of the Units, the LLC Agreement and the Executive Securities Agreement." (D.I. 12 at 6-7 (citing *Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1256-57 (Del. 2008), for broad interpretation of "arising

6

out of"); *but see* D.I. 15 at 8-9 (disputing applicability of *Pacific Ins.* and suggesting it relates only to insurance cases))

Plaintiffs counter that the release is more narrow, and emphasize its explicit reservation: "***except for*** any rights that ***expressly survive termination*** under such agreements." (D.I. 15 at 8) (emphasis added) Plaintiffs argue that the Redemption Agreement, by incorporating the LLC Agreement's definition of Fair Market Value, provided that all claims relating to that definition of Fair Market Value expressly survive. (*See id.* at 8).

In the Court's view, the release provision of the Redemption Agreement clearly and unambiguously applies to all of Plaintiffs' claims other than Counts II and VIII, as those two claims arise under the Redemption Agreement. The incorporation of a definition from the LLC Agreement does nothing to render the release provision unclear, ambiguous, or somehow inapplicable to Plaintiffs' other claims. None of Counts I, III-VII, or IX-XII "expressly survive" execution of the Redemption Agreement. Instead, all claims other than Counts II and VIII were released, by the express and broad language of the release provision, by which the parties:

> hereby ***release, waive, and forever discharge the Company*** [Defendants] . . . of and from any and all actions, causes of action, suits, losses, liabilities . . . which any [Plaintiffs] . . . ever had, have or hereafter may have . . . arising out of the Members' ownership of the Units, the LLC Agreement and the Executive Securities Agreement, except for any Claims relating to rights and obligations preserved by, created by or otherwise arising out of this [Redemption] Agreement.

(D.I. 1 Ex. 4 at 4.1.1) (emphasis added)

Plaintiffs argue that the release is unenforceable. (*See* Tr. at 39-41) But, as Defendants point out, "[t]here is no argument in the complaint itself that the release is somehow void or improper or anything like that. There is just nothing in this complaint suggesting that there is any reason why that release should be set aside." (Tr. at 11) Given the lack of any allegation in

7

the Complaint of fraud in connection with inducing execution of the Redemption Agreement (and, of course, the Court cannot assume that Plaintiffs would have a good faith basis to allege such fraud), the Court has no basis to hold that the release either is or may be proven to be unenforceable.

### B. Many of the Released Claims Suffer from Other Defects as Pled

Although the Court's interpretation of the release provision of the Redemption Agreement provides a sufficient basis to grant the motion to dismiss all but Counts II and VIII, Defendants assert that numerous other deficiencies plague these claims. Because the Court is providing Plaintiffs the opportunity to consider whether to try to file an Amended Complaint, the Court will address some – but not all – of the additional grounds for dismissal raised by Defendants. At least some of these additional ground are meritorious.

#### 1. MTS Is Not A Party to the LLC Agreement

Defendant MTS was not a party to the LLC Agreement and the Complaint does not allege any failure by MTS to perform a contractual duty. (D.I. 12 at 9-10) Therefore, at least Counts I and III, for breach of contract, need to be dismissed as against MTS. Plaintiffs' contention that MTS controlled Celerion's board and "interfere[d] with the Board's express duty to consider all relevant factors in determining the Fair Market Value" (D.I. 15 at 12), even if true, does not state a claim for breach of a contractual duty by MTS.

#### 2. The Fiduciary Duty Counts (IV-VI) Are Duplicative and Deficiently Pled

The parties agree that "for breach of contract and breach of fiduciary duty claims to co-exist there must be an independent basis for the fiduciary duty." (D.I. 12 at 10; *see also* D.I. 15 at 13) "To determine whether there is an independent basis for fiduciary claims arising from the same general events" on which a breach of contract claim is based, "the Court inquires whether

the fiduciary duty claims depend on additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy." *Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, 2015 WL 394011, at *7 (Del. Ch. Jan. 29, 2015) (internal quotation marks and citation omitted).

Plaintiffs have not met this requirement. Instead, the Court agrees with Defendants that in their claims for breach of fiduciary duties, "Plaintiffs simply restate the same allegations and damages as claimed for breach of contract." (D.I. 12 at 11 (citing Compl. ¶¶ 46-53); Tr. at 16 ("[T]hey're essentially duplicative claims . . .")) The breach of fiduciary duty claims, just like the breach of the Redemption Agreement claims, are predicated on Celerion's Board failing to fulfill its obligation to pay Fair Market Value for Plaintiffs' shares. Therefore, the fiduciary duty claims must be dismissed for those Defendants who are parties to the Redemption Agreement.

The Court will dismiss Counts IV-VI for all Defendants because, in addition to the flaw already identified, Plaintiffs' claims fail to plead that fiduciary duties are owed to them. As Defendants point out, "Section 8.1 [of the LLC Agreement] limits the liability of Managers [including MTS, a party charged in Count VI] to 'gross negligence, willful misconduct or knowing violation of law.'" (D.I. 12 at 13 (quoting Compl. Ex. 3 at 8.1); *see also Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013); *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 102 (Del. 2013)) Plaintiffs have not adequately alleged (in anything other than a conclusory manner) that Defendants have committed such conduct.

Having failed to state a claim for breach of a fiduciary duty, Plaintiffs have likewise failed to allege aiding and abetting a breach of fiduciary duties.

   **3. There is No "Gap" to Fill with an Implied Covenant, So Counts VII-IX Must Be Dismissed**

Under Delaware law, "the implied covenant 'cannot be invoked where the contract itself expressly covers the subject at issue." (D.I. 12 at 14) (quoting *Heritage Handoff Holdings, LLC v. Fontanella*, 2018 WL 3580287, at *2 (D. Del. July 25, 2018)) However, "a claim for violation of the implied covenant of good faith and fair dealing can survive if, notwithstanding contractual language on point, the defendant failed to uphold the plaintiff's reasonable expectations under that provision." (D.I. 15 at 15) (citing *Renco Grp., Inc.*, 2015 WL 394011, at *6)

The Court agrees with Defendants that the allegedly improper behavior here is covered by the terms of the parties' contracts; specifically, the Fair Market Value provision of the LLC Agreement. There is no "gap" to fill in the contract. Either the accused Defendants considered all of the pertinent factors (including what, if anything, Defendants knew at the time of the interest of Court Square or other potential acquirors) in meeting their obligation to pay Fair Market Value, or they did not.

Plaintiffs' conclusory argument that "Defendants violated their reasonable expectations" and did not act in good faith does nothing to save the claims. (Tr. at 46) Accordingly, the Court will dismiss Counts VII-IX.

### 4. The Fraud Counts Fail At Least for Lack of Reliance

The Complaint contains fraud claims arising under federal securities law, Delaware securities law, and common law. Plaintiffs argue that the facts pleaded demonstrate a "scheme to defraud Plaintiffs of the full and true value of their interests in Celerion," satisfying the pleading standards of Rule 9(b). (D.I. 15 at 16-17) Defendants counter that "Plaintiffs' Complaint fails to show scienter, reliance, or any fraudulent conduct with particularity." (D.I. 12 at 16)

10

Plaintiffs have failed to plead at least the element of reliance, which is a required element of Count X, which seeks to press a claim arising under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b). Plaintiffs do not allege that they sold their Units due to an allegedly material misrepresentation by Defendants. Instead, they allege the opposite: that Plaintiffs were bound by a prior agreement to sell their Units upon the termination of Fischer. At oral argument Plaintiffs argued that "they[] were relying on the good faith fair market valuation that the defendants said they'd made" and "[t]hey didn't have a gun to their head" to sign the agreement (Tr. at 34-35), but Plaintiffs have failed to explain how they could have legally avoided selling their shares to Defendants beyond challenging the fair market value as they do now. The Court agrees with Defendants: "At most, Plaintiffs contend that Defendants incorrectly valued their ownership interests." (D.I. 17 at 9) Count X does not meet the requirements of Rule 9(b) and will be dismissed.

The Court will also dismiss Count XI, alleging a violation of the Delaware Securities Act, 6 *Del. C.* § 73-201, because the only alleged nexus to Delaware is that it is Celerion's state of incorporation, and that "[t]he Award Agreement, LLC Agreement, and Redemption Agreement" are all governed by Delaware law. (D.I. 15 at 18; *see also* Tr. at 38) This is insufficient.

Defendants point to the following uncontested allegations: "Plaintiffs are not Delaware entities or residents. There is no allegation that any of the conduct at issue occurred in Delaware. There is also no allegation that any of the agreements were negotiated or performed in Delaware." (D.I. 12 at 17-18) (citing *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *19 (Del. Ch. Dec. 1, 2009); *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977)) Plaintiffs concede they have not found any case holding that having agreements governed by Delaware law can provide the basis for a claim under Delaware securities law. (Tr.

11

at 38) The facts alleged here do not create a "sufficient nexus between Delaware and the transaction at issue." *Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC*, 2014 WL 2457515, at *18 (Del. Ch. May 30, 2014) (internal quotation marks omitted).

Lastly, the Court will dismiss Count XII, alleging common law fraud, because Plaintiffs have failed to adequately allege inducement or reliance. Plaintiffs argue that "Defendants failed to disclose the information regarding the sale of Celerion to Court Square prior to the execution of the Redemption Agreement and in order to induce Plaintiffs into executing the Redemption Agreement." (D.I. 15 at 18) However, as already noted in connection with the federal securities fraud claim, Plaintiffs were already contractually bound to sell their shares to Defendants. In the Court's view, Plaintiffs' claims sound in breach of contract, not fraud.

### C. Count II, Alleging Breach of the Redemption Agreement, Will Not Be Dismissed

Defendants argue: "The Redemption Agreement . . . demonstrates the parties' mutual understanding that Celerion would have discretion to calculate the 'Fair Market Value' and that Plaintiffs could challenge that discretion *only* if Celerion applied it in bad faith." (D.I. 12 at 7) They highlight the portion of the "Fair Market Value" definition providing "determined by the Board *in its good faith judgment* taking into account all relevant factors determinative of value." (*Id.*) While Plaintiffs allege Defendants acted in bad faith, to Defendants these allegations are merely conclusory, based on the happenstance that the Court Square transaction occurred four months after the Redemption Agreement was signed and allegations – supported only by "information and belief" – that negotiations leading to that transaction began earlier. (*See id.* at 8)

On this one Count, however, the Court agrees with Plaintiffs that they have adequately stated a claim on which relief may be granted. Plaintiff explained their allegations at the hearing

as follows: "[W]e allege bad faith, we allege a scheme, through not just the undervaluation but from the start of triggering the repurchase rights by terminating the plaintiff to then undervaluing, to concealing the pertinent facts, to then – continuing to conceal the facts when the plaintiffs reached out and sought explanation for the valuation that they received, to representing that the value was made in good faith under the LLC Agreement." (Tr. at 28-29)

The Court concludes that Plaintiffs' allegations of bad faith are adequately pled. Based on the timing of Fischer's termination, the unit repurchases, and the eventual Court Square sale, it is reasonable to infer that the potential for a Court Square transaction was known to Defendants prior to the repurchase of Fischer's Units yet was not (due to bad faith) factored into the Purchase Price. All of this states a plausible claim for breach of the Redemption Agreement. As Plaintiffs write, "[a]llegations that Celerion and its Board were aware of Court Square's interest in purchasing Celerion at a share-price greater than what was offered to Plaintiffs, when the Board was setting the Fair Market Value of the shares[,] is clearly sufficient to state a cause of action for breach of contract under the relevant provisions of the Redemption Agreement." (D.I. 15 at 10)

The Court will not dismiss Count II.[2]

### D. Amendment

Plaintiffs request the opportunity to amend their claims, in the event – as has occurred – the Court dismisses any of them. (*See* Tr. at 50) The Court regrets the length of time it has taken to resolve the motion to dismiss but, having done so, would now prefer to see this case

---

[2] The parties have disputed whether Plaintiffs' right to a jury trial was waived by execution of the LLC Agreement and the Redemption Agreement. (*See* D.I. 12 at 20; D.I. 15 at 18-19) Plaintiffs do not seek a jury trial for their contract claims. (D.I. 15 at 18; D.I. 12 at 20) As only a breach of contract claim has survived the motion to dismiss, at this point the issue over jury trial waiver is moot.

13

proceed on the claims that have survived the motion to dismiss. Nevertheless, Federal Rule of Civil Procedure 15(a) mandates that leave to amend be granted freely. *See also Spartan Concrete Prods., LLC. v. Argos USVI Corp.*, 929 F.3d 107, 115 (3d Cir. 2019). While the Court has identified meritorious dismissal arguments for 11 of Plaintiffs' 12 claims – and has not addressed all of Defendants' arguments for dismissal, meaning that some of the unaddressed arguments may also have merit – Plaintiffs will be given one final opportunity to attempt to amend their claims.[3]

To improve the chances of the Court being able to efficiently determine if any amended claims should be added to the case, the Court will authorize Plaintiffs to file a motion for leave to amend, which, if filed, would be briefed according to the Court's letter briefing procedure. *See* https://www.ded.uscourts.gov/judge/chief-judge-leonard-p-stark. Given the Court's familiarity with the case, and the thorough briefing and argument received in connection with the motion to dismiss, short letter briefs should be adequate to permit the parties to present their positions with respect to a proposed amended complaint (should Plaintiffs seek to file one).

The Court will direct the parties to advise the Court as to whether Plaintiffs wish to file a motion for leave to amend and, if so, on what schedule it will be filed and briefed.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss will be granted in part and denied in part. Plaintiffs will be permitted to file a motion for leave to file an amended complaint.

---

[3] The Court is not persuaded by Defendants' contention that the request to amend is untimely (*see* Tr. at 55), as most of the purported delay that has occurred is due to the pace at which the Court has handled this case.